W. H. APPLEGATE, Appellant, v. W. H. APPLEGATE, H. M. WYCKOFF, THE CORN EXCHANGE BANK, ERNEST A. HAMILL, RUTH A. APPLEGATE AND C. C. APPLEGATE, Administrator of the Estate of J. A. APPLEGATE, Deceased.

**Creditor's Bill: JUDGMENT.** A judgment rendered in an accounting in an action between a firm and its individual members fixing the amount due, ordering execution and providing for the application of the funds in the hands of a receiver and the individual partners, is a final judgment on which an action to set aside a fraudulent conveyance may be brought as soon as rendered, although subsequently the court made further findings determining what amounts should be applied upon the judgment from the money and property in the hands of the receiver and of some of the members of the firm.

**JUDGMENT AS BASIS.** A personal judgment against the executor of plaintiff's deceased debtor, after he had been discharged from his

trust, created no lien on the lands of decedent, and gave plaintiff no right to complain of any fraudulent conveyance thereof.

PRIORITY OF CREDITORS. A judgment creditor of a fraudulent grantee who was as well fraudulent grantor, which extended credit to the latter upon the strength of his ownership of the property, with no knowledge that anyone claimed a conveyance to him, was in fraud of creditors, and which subjected the land to the payment of its claims before any steps were taken by the creditors of the fraudulent grantor, is entitled to priority over the latter.

COLLATERAL ATTACK. A decision of the court determining whether jurisdictional facts exist in a proper instance authorizing it to proceed is conclusive as against a collateral attack.

SAME. A judgment which is good between the parties cannot be adjudged void as to strangers, in the absence of fraud or collusion.

RULE APPLIED. A sale of land under execution on a judgment in an attachment suit against a fraudulent vendee, was not subject to a collateral attack by the judgment creditor of the fraudulent vendor, on the ground that the defendant in such attachment suit had no notice thereof, where such defendant had appeared to a creditor's bill founded thereon, and answered, admitting that such action had been brought against him, and pleaded that he had sold the property in controversy to one who had intervened in the attachment suit, in both of which proceedings the attaching creditor prevailed, and where such defendant, *after* the sale on execution, appeared in the attachment suit, and moved that such sale be set aside for want of jurisdiction in the attachment proceedings, there raising want of notice for the first time; which motion was denied.

STATUTE OF LIMITATIONS. Under Code, 1873, section 2533, providing that the time during which the defendant is a non-resident of the state shall be excluded, in computing periods of limitation, the right to bring an action to set aside a fraudulent conveyance to a non-resident grantee was not barred by the statute where it was brought within five years after the conveyance of the property in controversy to a resident of the state.

LACHES. In an action for an accounting by and between the members of a co-partnership, in which a receiver of the property of the firm was appointed, pending the litigation, separate judgments were rendered in favor of certain members of such firm against their co-partners, and the money in the receiver's hands was thereby directed to be applied pro rata in the payment of such judgments. The judgment creditors were also required to account for and apply in like manner certain property and money in their hands, belonging to the firm. Further orders were subsequently made therein, from time to time, until all the property of the co-partnership was disposed of and accounted for, whereupon, but

more than five years after the principal judgments were rendered, the holder thereof brought suit in equity to subject, in satisfaction of the balance due thereon, certain real estate alleged to have been conveyed by the judgment debtor in fraud of his creditors. *Held,* that, under such circumstances, plaintiff's delay in bringing such suit would not defeat his right to recover; since, the suit was begun shortly after the receiver made his report, and all the property of the partnership was disposed of and accounted for, and the exact amount which would remain unpaid could not be determined until that time.

*Appeal from Cass District Court.*—HON. W. R. GREEN, Judge.

WEDNESDAY, JANUARY 25, 1899.

CREDITORS' bill to subject certain lands, the title to which was at one time in S. J. Applegate, to the payment of plaintiff's judgment against him. The title to the land is now in Ernest A. Hamil, or the Corn Exchange Bank, derived through a sale of property on execution from a judgment wherein the Corn Exchange Bank was plaintiff, and W. J. Applegate, the grantee of S. J. Applegate, was defendant. It is claimed, among other things, that the judgment upon which the execution issued, and under which the land was sold, was and is of no validity, for the reason that the court which rendered it had no jurisdiction of W. J. Applegate. Some other claims are made, which will be hereafter considered. The trial court dismissed plaintiff's petition, and he appeals.—*Affirmed.*

*Curtis, Follett & Curtis* for appellant.

*Phelps & Temple* for appellees.

DEEMER, J.—Stated as shortly as may be, the facts are as follows: In 1886 one S. J. Applegate was the owner of the property in controversy, consisting of eighty acres of land and two town lots in the city of Atlantic. In December of that year he conveyed the same to his son, W. J. Applegate, the

deed expressing a consideration of nine thousand five hundred dollars. W. J. Applegate held title to the property until 1890, when he conveyed it to George M. Barber, who held the title until April 7, 1891, when he re-conveyed the same to W. J. Applegate. A few days prior to this last conveyance, Applegate deeded the land to H. M. Wyckoff, but the deed to Wyckoff and re-conveyance from Barber to Applegate were not recorded until September of the year 1891. On the fourth day of April, 1891, the Corn Exchange Bank of Chicago, Ill., commenced an action against W. J. Applegate et al., upon certain promissory notes of the said Applegate, and caused an attachment to be issued and levied upon the property in controversy. At the same time it commenced an equitable action to subject the property, claiming that it had been conveyed in fraud of creditors. W. J. Applegate and George M. Barber were both made parties to this suit. Barber made no appearance, but Applegate appeared and filed an answer setting up the re-conveyance from Barber, and stating that he had sold the property to Wyckoff, who was alleged to be the owner, and denying the issuance and levy of the attachment in the action on the notes. Wyckoff intervened and claimed title under his conveyance from Applegate. No appearance was made to the law action, and judgment was rendered for the amount of the notes, and the attachment established as a lien against the attached property. A supplemental petition was then filed in the equity suit, reciting the recovery of judgment and the confirmation of the attachment, and asking that the judgment be made a lien upon the property, and that the conveyances from Applegate to Barber and to Wyckoff be set aside as fraudulent. On these issues that suit was tried to the court, resulting in a decree as prayed, from which an appeal was taken to this court, where the decree was affirmed. See 91 Iowa, 411. After the decree was rendered, an execution issued, and the land was sold to the bank for something over seven thousand dollars. No redemption having been made, a deed issued to defendant

Ernest A. Hamill on March 8, 1894, and Hamill went into possession of the property. Appellant is a judgment creditor of S. J. Applegate, who obtained his judgments in this manner: Prior to the year 1886, J. C. Yetzer, S. J. Applegate, and this plaintiff, W. H. Applegate, were associated together as partners in the pork-packing business in the city of Atlantic, under the name of W. H. Applegate & Co. Dissensions arose between the members of this co-partnership, resulting in a great deal of litigation. In an action wherein J. C. Yetzer was plaintiff and W. H. Applegate & Co., *et al.* were defendants, S. J. Applegate was appointed receiver of the property of the co-partnership, pending an action between the firm and the individual members thereof, and J. C. Yetzer was a surety on his bond as such receiver. In that accounting preceding, judgment was rendered in favor of J. C. Yetzer and against S. J. Applegate for the sum of five thousand six hundred and twenty-one dollars and eighty-four cents, and in favor of this plaintiff, and against S. J. Applegate for the sum of one thousand two hundred and sixty-three dollars; and it was further provided that the receiver should make report, and that the money in his hands should be used for the payment of these judgments. The judgments were rendered in November of the year 1888, and it was provided in the decree that certain of the partners should further account for certain property used by them. Execution was also ordered for the collection of the judgments. On March 7, 1893, one day prior to the sale of the property in controversy to the Corn Exchange Bank, Yetzer commenced an action against W. J. Applegate and the Corn Exchange Bank to set aside the conveyance of the property from S. J. to W. J. Applegate; but in December, 1893, he voluntarily dismissed that action at his cost. At the same time he commenced an action against W. J. Applegate and Ruth Applegate to set aside a deed to a forty-acre tract of land lying just north of the land in controversy, but neither the bank nor Hamill were made parties to this litigation. In

March, 1894, a final accounting was had between the members
of the firm of W. H. Applegate & Co., in the district court, in
the main accounting suit; and the amount in the hands of
the receiver was determined, the receiver's compensation was
also fixed, and a division of the costs made.   The receiver
failed to turn over the money in his hands, which consisted
largely of payments made by certain insurance companies in
settlement of their liability for certain property of the firm
which had been destroyed by fire.   And in April, 1894, plain-
tiff commenced suit against C. C. Applegate, executor of the
estate of S. J. Applegate, deceased (S. J. Applegate having
died in March, 1891), and Yetzer as surety on the receiver's
bond; and in December, 1894, recovered a personal judgment
against the executor and Yetzer for the sum of about two
thousand dollars.   The executor had in the meantime made
his final report, and received his discharge in April of
the year 1893.   It appears that the receiver turned over
nearly all the funds in his hands to W. J. Applegate, and that
the plaintiff, W. H. Applegate, knew of this misappropriation
as early as November of the year 1886.   In March of 1895,
W. H. Applegate caused an execution to issue on his judgment
against the executor and Yetzer, which was levied upon the
judgment obtained by Yetzer against S. J. Applegate, and
the said judgment was sold to plaintiff herein for the sum of
sixty dollars.   In November of the year 1894, plaintiff com-
menced this action upon the original judgment recovered by
him against S. J. Applegate in the accounting proceedings;
asking that the conveyance from S. J. to W. J. Applegate be
set aside, and that his lien be made prior to that of the Corn
Exchange Bank and Hamill.   By supplemental petition the
plaintiff also included the judgment obtained by Yetzer
against S. J. Applegate, which he purchased at execution sale,
as before stated, and the judgment obtained by him against
C. C. Applegate, executor.   The issue is between plaintiff, the
Corn Exchange Bank, and Hamill.

It is clearly shown that the conveyance from S. J. to W. J. Applegate, executed in December, 1886, of the land in controversy, was fraudulent and void, because made with intent to hinder, delay, and defraud the creditors of S. J. Applegate. And it must also be accepted as a fact that the conveyances from W. J. Applegate to Barber and to Wyckoff were also fraudulent, because made to defeat the creditors of W. J. Applegate. And the first question which arises is as to the right of plaintiff to maintain his suit upon his judgments. If the judgments in the accounting case were final, then plaintiff's action upon the Yetzer judgment, and upon the judgment in his favor rendered in that case, had sufficient basis; and, on the face of the records, in so far as it is based upon these two judgments, is barred, for the reason that the conveyance was made in 1886, and this action was not commenced until November, 1894. *Hawley v. Page,* 77 Iowa, 239; *Laird v. Kilbourne,* 70 Iowa, 83; *Mickle v. Walraven,* 92 Iowa, 423; *Sims v. Gray,* 93 Iowa, 38.

Appellant insists first, however, that the judgments rendered in the accounting case were not final, and did not become so until the year 1894. We do not so regard them. An unconditional judgment was rendered in the accounting case November 14, 1888, in favor of W. H. Applegate and against S. J. Applegate, for something over one thousand two hundred dollars, and a like judgment was rendered in favor of J. C. Yetzer and against S. J. Applegate for more than five thousand dollars, each of which judgments drew six per cent. interest from date. It was further ordered, however, that the receiver should immediately report the amount of money held by him, which was directed to be applied *pro rata* in the payment of the judgments and costs. And it was further ordered that Yetzer and Applegate should each make an accounting of the property and money in their hands belonging to the firm, which, when so accounted for, should be applied in the same

proportion as the money held by the receiver. The judgments in favor of Yetzer and W. H. Applegate against S. J. Applegate were final; that is, the amount due was fixed, execution was ordered, and application of the funds in the hands of the receiver and the individual partners was provided for. In April of 1894 the court made further findings as to the amounts to be applied on these judgments, the compensation of the receiver, and as to the state of the account between Yetzer and W. H. Applegate. Another order was entered in the case December 22, 1894, which recognized, however, the validity of the original judgments. We are of opinion that the original judgments against S. J. Applegate were final, and that all that was done thereafter was to determine what amounts should be applied thereon from the money and property in the hands of the receiver and some of the members of the firm. If they were final, then plaintiffs therein had the right to bring actions thereon to set aside a fraudulent conveyance as soon as the said judgments were rendered. But it is said that as W. J. Applegate, the fraudulent grantee, was at all times a non-resident of this state, the statute did not begin to run until the title was acquired by some one who resided in this jurisdiction, against whom action might be brought. It appears from the record that W. J. Applegate was a non-resident of the state, as claimed; and it follows that the statute did not begin to run until the conveyance to Barber, in the year 1891. See Code 1873, section 2533. And, as plaintiff commenced his action within five years from that date, it is not barred by the statute. Appellees contend that appellant is guilty of such laches as that he is not entitled to recover. Suffice it to say, in answer to this claim, that the facts are such that we do not believe the doctrine of laches should apply. While his judgment was final, yet the exact amount that would remain unpaid could not be determined until the receiver made his report, and all the property of the co-partnership was disposed of and accounted

for. Shortly after this was done, plaintiff commenced his suit in equity to subject the real estate. We think his delay is not such as to defeat his action.

II. One of plaintiff's judgments is against the executor of S. J. Applegate, deceased, and J. C. Yetzer. The action in which it was obtained was commenced after the death of S. J. Applegate, deceased. If this judgment amounts to anything, it is a personal judgment against C. C. Applegate. As S. J. Applegate was dead, no judgment could be obtained against him; and a judgment against an executor who has been discharged from his trust is of no validity, except, possibly, as against the executor personally. In any event, this judgment never became a lien upon the lands of S. J. Applegate; and, as plaintiff did not exhaust his remedies at law against the estate of S. J. Applegate, he is in no position to complain of the conveyances of the property, in virtue of ·his judgment against C. C. Applegate, executor. Unless it be, then, for some of the other defenses pleaded by appellees, appellant is entitled to subject the land to the payment of his original judgment, and to the judgment in favor of Yetzer which was purchased by him at execution sale. It appears, however, on the face of the records, that Hamill has a sheriff's deed to the land, obtained through an execution sale upon a judgment which on its face seems to be regular and valid. This ·judgment was obtained in the attachment proceedings and the equitable suit brought by the Exchange Bank, to which we have already referred. Appellees contend that W. J. Applegate, the defendant in the attachment proceedings, was a non-resident of the state, and had no notice of the action, that the notice was served upon another party, and that he had no knowledge of the action until long after the judgment, which was in *rem,* was entered. It must be conceded that the evidence taken upon this trial shows that W. J. Applegate was not served with notice of the attachment suit. He made an appearance to the creditor's bill founded thereon, however, and filed an answer in

which he pleaded the re-conveyance of the property from:
Barber to himself, and further stated that he had sold the
property to Wyckoff. He also admitted that the bank had
commenced an action against him, and that a writ of attach-
ment was asked for. See 91 Iowa, 411. That action went to
decree, as we have stated, and it lies at the foundation of the
Hamill claim. It further appears that, after the sale on
execution was made, Applegate appeared in the attachment
suit, and filed a motion to set aside the sale, based on the
ground that the court had no jurisdiction, because of want of
notice of the proceedings. The trial court denied his
motion, and he appealed to this court, where the order was:
affirmed. See 97 Iowa, 67. Appellant contends that he is
not bound by the findings in that case, and insists that he has
a right to attack the proceedings because of want of jurisdic-
tion of the court over W. J. Applegate; and this brings us to
the principal point of difference in the case. There can be no
doubt that the court had jurisdiction of the creditors' bill
brought by the bank to subject the property to the payment
of the judgment it held against W. J. Applegate, for the rea-
son that he appeared to that proceeding and filed an answer.
In answer he did not, as we understand it, question the valid-
ity of the attachment proceedings. But, whether he did or
not, it appears to us that it was his duty to do so, if he had
any defense thereto. Had he done so, and had the court found
against him on such an issue, there is no doubt that his only
remedy for an erroneous decree would have been by appeal.
Neither he nor a stranger could collaterally attack the decree
subjecting the property to the plaintiff's claim. An illustra-
tion will make this point more clear. Suppose that the bank
had obtained no judgment, but had sought to subject the
property which it claimed belonged to Applegate to the pay-
ment of a simple note claim, or to the payment of an account;
suppose, also, that Applegate appeared, and pleaded that such
a claim would not sustain the action, but was defeated; could
a stranger take advantage of this erroneous decision? Aye,

could Applegate himself attack the judgment collaterally for want of jurisdiction? Manifestly not, we think. The court had jurisdiction of the subject-matter,—the setting aside of conveyances in fraud of creditors,—and it had jurisdiction of the person, because of his appearance. Having this jurisdiction, the decree was final, unless reversed or attacked by direct proceedings. But this case is even stronger than the one we have supposed. Here Applegate not only appeared to the equitable suit to subject the property, and was thus bound by the decree, but he also appeared in the attachment case, and there filed a motion based on the same grounds now relied upon by appellant for setting aside the sale and deed to Hamill. In that case he was defeated. See 97 Iowa, 67 That judgment and all proceedings are final and conclusive as to W. J. Applegate. He is absolutely bound thereby, and the deed to Hamill divests him of all title to or claim in the property. It is said, however, that appellant, W. H. Applegate, was not a party to these proceedings, and was not bound thereby, and that he can attack the judgment and sale for want of jurisdiction. This, no doubt, is the general rule. But a judgment which is without jurisdiction is not a judgment. It has been said to be as so much waste paper. It is absolutely void and of no validity as to any one. We have, then this inquiry: Can a judgment be valid as between the parties, and invalid as to third parties, because of want of jurisdiction? If one so acts as to estop himself from questioning a judgment rendered against him, can a third person take advantage of the defect, and have the judgment decreed a nullity? The books furnish no uncertain answer to these questions. Indeed, it is quite generally held that if a court has jurisdiction over a general class of subjects,—as, for instance, the rendition of a judgment in *rem* against real estate situated in this state, the defendant being a non-resident,—and the court is required to ascertain and decide whether the facts essential to jurisdiction in the par-

ticular case exist, its decision cannot be collaterally impeached.

This rule does not mean that any judicial tribunal can create jurisdiction for itself. That no court can do.

But it does mean that the court may ascertain and conclusively decide against a collateral attack, whether jurisdictional facts exist, in a particular instance, authorizing it to proceed. See *Evansville, I & C. S. L. R. Co. v. City of Evansville,* 15 Ind. 395; *Betts v. Bagley,* 12 Pick. 572; *Vanderheyden v. Young,* 11 Johns. 150; *Bonsall v. Isett,* 14 Iowa, 309; *Commissioners v. Aspinwall,* 21 How. 539; *McNitt v. Turner,* 16 Wall. 352; *Thompson v. Tolmie,* 2 Pet. 157; *Ryan v. Varga,* 37 Iowa, 78; *Koehler v. Hill,* 60 Iowa, 543; *Cooper v. Sunderland,* 3 Iowa, 114; *Morrow v. Weed,* 4 Iowa, 77. It must be remembered that W. J. Applegate not only had the opportunity to defeat the equitable suit brought against him by the Exchange Bank by pleading no judgment in the attachment proceedings, but that he also appeared in the attachment proceedings and moved to set aside the judgment and sale because he was not served with notice of the proceedings. Having appeared in the attachment case, and submitted to the jurisdiction of the court, he gave the court full power and authority to determine the question as to whether or not he had been served with notice in the original attachment suit. The court determined that he had been, or that he was in no position to complain of want of service, and that ruling was affirmed by this court. Surely the court had jurisdiction of the parties and of the subject-matter in that proceeding, and its judgment cannot be collaterally attacked. If it may be, then a judgment as to jurisdictional facts is never conclusive, but may be collaterally attacked at any time and by any person. When it is conceded that W. J. Applegate is concluded by the orders made in the attachment case, the whole matter is determined; for, if the judgment is void for want of jurisdiction, it is void as to every one, and, if not void as to the original defendant, it is not void as to any other person. Freeman Judgments, section 523, and cases cited; *Dwight v. St.*

*John,* 25 N. Y. 203 ; *Hawk v. Evans,* 76 Iowa, 593. Certain
it is that both the bank and W. J. Applegate are concluded by
the ruling on the motion to set aside the judgment and sale.
And, if they are concluded, this plaintiff must be, for a judg-
ment which is good between the parties cannot be adjudged
void as to strangers, in the absence of fraud or collusion. We
are firmly of opinion that the judgment in the attachment
case is not subject to the attack made upon it.

III. In oral argument, appellant's counsel insisted
that as his client was a judgment creditor of S. J. Applegate,
the original fraudulent grantor, and as the Exchange Bank
was a creditor of W. J. Applegate, a fraudulent grantee,
and also a fraudulent grantor of the property, he (appellant)
is entitled to priority over the bank, and to have his
lien first established. The evidence shows that the
bank extended credit to W. J. Applegate upon the
strength of his ownership of the land. It had no knowledge
at the time it gave this credit that any one was claiming the
conveyance from S. J. Applegate to him was in fraud of cred-
itors. True, an action had been brought by Yetzer in March
of 1893 against S. J. Applegate and the bank to subject the
property to the payment of his judgment in the accounting
case ; but this action was dismissed in December of that year,
and was not renewed or attempted to be renewed until appel-
lant filed a supplemental petition in March of 1895, based
upon the same judgment, which he had purchased on execu-
tion, as before stated. When defendants extended credit, and
took title to the lands under the sheriff's sale, there was no
claim that the deed from S. J. to W. J. Applegate was fraud-
ulent. The judgment against S. J. Applegate upon which
appellant predicates his action were not such liens upon the
property as to give third persons notice thereof ; and the con-
veyance between S. J. and W. J. Applegate was good as to all
the world, save and except the creditors of Applegate. *Wright
v. Howell,* 35 Iowa, 288. Under such a state of facts as is
here presented, it seems to be held by all courts that have had

occasion to examine the matter that the creditors of the fraudulent grantee, who have subjected the land to the payment of their claims before any steps are taken by the creditors of the fraudulent grantor, are entitled to priority. See *Robinson v. Monjoy,* 7 N. J. Law, 173; *Gibbs v. Chase,* 10 Mass. 125; *Parker v. Freeman,* 2 Tenn. Ch. 612; *Susong v. Williams,* 1 Heisk. 625; *Budd v. Atkinson,* 30 N. J. Eq. 530; *Powell v. Ivey,* 88 N. C. 256; *Chapin v. Pease,* 10 Conn. 69. What the rule might be under a different state of facts, we have no occasion to determine.

Many other questions are presented in argument, but as they are not regarded as controlling, we do not consider them. The decree of the district court is right, and it is AFFIRMED.